J-S06034-23

2023 PA SUPER 66

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
:
v. :
:
:
:
:
JEFFREY WARREN SHACKELFORD :
:
Appellant : No. 1297 MDA 2022

Appeal from the Judgment of Sentence Entered August 29, 2022
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0004171-2021

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
:
v. :
:
:
:
:
JEFFREY WARREN SHACKELFORD :
:
Appellant : No. 1298 MDA 2022

Appeal from the Judgment of Sentence Entered August 29, 2022
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0003662-2021

BEFORE: STABILE, J., NICHOLS, J., and STEVENS, P.J.E.*

OPINION BY STEVENS, P.J.E.: **FILED: APRIL 14, 2023**

Jeffrey Warren Shackelford ("Appellant") appeals from the February 27,

2019, judgment of sentence entered in the Court of Common Pleas of

Lancaster County after a jury found him guilty on Docket 4171-2021 of Drug

Delivery Resulting in Death and Criminal Use of a Communication Facility and

guilty on Docket 3662-2021 of Possession with Intent to Deliver 17 grams of

_____

* Former Justice specially assigned to the Superior Court.

Fentanyl and Possession with Intent to Deliver 87.68 grams of Methamphetamine. After careful review, we affirm.

The trial court has authored an opinion pursuant to Pa.R.A.P. 1925(a) in which it sets forth the pertinent facts and procedural history, as follows:

In the early morning hours of April 14, 2021), Carrie Hamilton's boyfriend, Elvin Bradley, found her unresponsive on his bathroom floor. Notes of Testimony, Jury Trial, June 6-8, 2022, at 108-109 (hereinafter "N.T. at ____."). Carrie had no heartbeat when emergency medical personnel arrived and although lifesaving interventions were able to temporarily restore her pulse, she died in the hospital several hours later. N.T. at 123-25, 260. A screen of Carrie's urine performed shortly before she was pronounced dead was positive for fentanyl, cocaine, and opioids. N.T. at 260. The Lancaster County Coroner subsequently determined that the cause of Carrie's death was combined drug toxicity. N.T. at 261.

The investigation into Carrie's death revealed that on the evening prior to her overdose, Mr. Bradley picked Carrie up, took her to an ATM, and subsequently drove her to a Turkey Hill gas station where Carrie said that she had to meet and "get some stuff from a friend of hers." N.T. at 85, 92-93, 97, 100-01. When Carrie and Mr. Bradley arrived at the Turkey Hill, Carrie got out of the vehicle and entered a white Jeep where she remained for approximately five minutes before returning to Mr. Bradley's car. N.T. at 100-01.

After Carrie and Mr. Bradley returned home, they both got ready for bed. N.T. at 108. Mr. Bradley fell asleep and woke around 4 a.m. N.T. at 108-09. When he realized that Carrie was not next to him, he got up to look for her, found her unresponsive on the bathroom floor and called 911. N.T. at 108-09 After Carrie was transported to the hospital, Detective Lee Billiter from the Manheim Township Police Department organized an investigation of the scene. N.T. at 174. Detectives located, among other things, cocaine, heroin laced with fentanyl and tramadol, associated drug paraphernalia, and Carrie's cell phone. N.T. 220-221.

A search of Carrie's phone revealed that on the night before her death, she had been communicating with a number ending in "7678", labeled in her phone contacts as "Jazz." N.T. at 195-208. Detective Billiter contacted Detective Thomas Ziegler, a member of the Lancaster County Drug Taskforce to inquire about the "7678" number. N.T. at 196. Detective Ziegler indicated that he was familiar with the "7678" number and the moniker "Jazz"—he identified both as belonging to Appellant Jeffery Shackleford, whom he was presently investigating for dealing drugs. N.T. at 196; 318-19.

The text message thread between Carrie and "Jazz" included a request from Carrie to buy drugs—namely, crack cocaine, methamphetamine, and heroin—from "Jazz." N.T. at 203-05. The thread also included messages between the two outlining when and where they would meet. N.T. at 208-12. The texts aligned precisely with video footage captured from surveillance cameras that showed Carrie stopping at an ATM and entering a white Jeep in the Turkey Hill parking lot. N.T. at 98-107; 212-14.

After learning of Detective Billiter's investigation involving Appellant, Detective Ziegler executed a search warrant on Appellant's home [] on August 20, 2021. N.T. at 320-22. Searching detectives and officers located a large amount of wax packets and rubber bands used for packaging and selling drugs, a digital gram scale, a scraping tool, approximately $ 7,900 in U.S. currency, over 250 wax paper bags of packaged fentanyl mixed with heroin, over 80 grams of methamphetamine, and quantities of cocaine and marijuana. N.T. at 337-39, 341, 344, 350.

When Detective Ziegler and accompanying police officers executed the warrant, Appellant was present in the home. He was arrested and then transported to the Lancaster City Police Detective Unit to be interviewed. N.T. at 328; 395. Appellant admitted that he got paid to bag up drugs to be sold and that the $7,900 found in his residence was money he had earned from packing drugs. N.T. at 363, 366. He also admitted that he sold drugs to Carrie Hamilton the night before her death and identified the "7678" number saved as "Jazz" in Carrie's phone as belonging to him. N.T. at 395; 399.

Charges were thereafter filed against Appellant on two information numbers. On 4171-2021, Appellant was charged with Drug Delivery Resulting in Death and Criminal Use of a Communication

Facility; on 3362-2021, Appellant was charged with Possession with Intent to Deliver Fentanyl, possession with intent to Deliver Methamphetamine, possession of Marijuana, and Possession of Drug Paraphernalia.

On March 14, 2022, the Commonwealth filed a Notice of Intent to try both Informations together. On March 22, 2022, Appellant filed a Motion for Separate Trial. [The trial court] presided over a hearing on Appellant's motion on May 16, 2021. On May 20, 2021, [the trial court] denied Appellant's request to have the Informations severed.

A jury trial commenced on June 6, 2022. On June 8, 2022, the jury found Appellant guilty of the following: on docket 4171-2021, Drug Delivery Resulting in Death and Criminal Use of a Communication Facility; on docket 3662-2021, Possession with Intent to Deliver 17 grams of Fentanyl and Possession with Intent to Deliver 87.68 grams of methamphetamine. After ordering and receiving a Pre-Sentence Investigation [report], [the trial court] sentenced Appellant on August 29, 2022, to an aggregate term of 11-25 years imprisonment.

On September 9, 2022, Appellant filed a Notice of Appeal to the Superior Court.[1] On that same day, [the trial court] ordered Appellant to file a statement of matters complained of on appeal. Appellant timely filed his Concise Statement of Matters Complained of on Appeal ("Statement") on September 12, 2022. The Commonwealth responded on September 22, 2022.

_____

[1] On August 29, 2022, Appellant was sentenced at two trial court dockets (CP-36-CR-0004171-2021 and CP-36-CR-0003662-2021). On September 9, 2022, counsel for Appellant filed two notices of appeal, pursuant to *Commonwealth v. Walker*, 185 A.3d 969 (Pa. 2018), which were docketed in this Court at Nos. 1297 MDA 2022 and 1298 MDA 2022. Each notice contains two trial court docket numbers, and one number was specifically marked on each notice. *See Commonwealth v. Johnson*, 236 A.3d 1141, 1148 (Pa. Super. 2020) (approving the filing of separate but identical notices of appeal as compliant with the dictates of *Walker*). Pursuant to this Court's policy regarding multiple *Walker* appeals, the instant appeals were consolidated, *sua sponte*, by order of September 27, 2022.

Trial Court Opinion, 11/9/2022, at 1-4.

Appellant presents the following issues for this Court's consideration:

1. Did the Suppression Court err by failing to find that the search warrant issued without probable cause?

2. Did the Trial Court err by failing to order separate trials of the Informations?

Brief of Appellant, at 4.

In Appellant's first issue, he challenges the order denying his motion to suppress evidence obtained from the execution of the search warrant issued for the search of Appellant's residence at 501 Goldfinch Drive. The search warrant issued without probable cause, he maintains, because no facts were presented to the district judge to explain the CI's basis of knowledge for making the claim against him. He posits, therefore, that his motion to suppress was wrongly denied such that all post-arrest evidence obtained should have been deemed inadmissible at trial.

We begin by acknowledging the applicable standard of review:

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. When reviewing the ruling of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence of the defense as remains uncontradicted when read in the context of the record. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

> ***Commonwealth v. Bumbarger***, 231 A.3d 10, 15 (Pa. Super. 2020) (citation and ellipses omitted). Our scope of review is limited to the evidence presented at the suppression hearing. ***Commonwealth v. Bellamy***, 252 A.3d 656, 663 (Pa. Super. 2021). With respect to a suppression court's factual findings, "it is the sole province of the suppression court to weigh the credibility of the witnesses. Further, the suppression court judge is entitled to believe all, part or none of the evidence presented." ***Commonwealth v. Caple***, 121 A.3d 511, 516-17 (Pa. Super. 2015) (citation omitted).
>
> At a suppression hearing, "the Commonwealth has the burden of establishing by a preponderance of the evidence that the evidence was properly obtained." ***Commonwealth v. Galendez***, 27 A.3d 1042, 1046 (Pa. Super. 2011) (*en banc*) (citation, quotation marks, and brackets omitted); ***see also*** Pa.R.Crim.P. 581(H) (at a suppression hearing, the Commonwealth "shall have the burden … of establishing that the challenged evidence was not obtained in violation of the defendant's rights."). The preponderance of the evidence is "the lowest burden of proof in the administration of justice, and it is defined as the greater weight of the evidence, *i.e.*, to tip a scale slightly in one's favor." ***Commonwealth v. Ortega***, 995 A.2d 879, 886 n.3 (Pa. Super. 2010).

***Commonwealth v. Heidelberg***, 267 A.3d 492, 498–99 (Pa. Super. 2021)

(*en banc*).

Our review of a challenge to a search warrant based on an affidavit of probable cause is limited to "the information within the four corners of the affidavit." ***Commonwealth v. Batista***, 219 A.3d 1199, 1202 (Pa. Super. 2019) (quoting ***Commonwealth v. Rogers***, 615 A.2d 55, 62 (Pa. Super. 1992) and citing Pa.R.Crim.P. 203(D))[2]. Thus, a reviewing court "may not

---

[2] Pennsylvania Rule of Criminal Procedure 203, "Requirements for Issuance", provides in subsection (D) the following:

*(Footnote Continued Next Page)*

conduct a *de novo* review of the issuing authority's probable cause determination" but, instead, is tasked simply with the duty of ensuring the issuing authority "'had a substantial basis for concluding' that probable cause existed." **Batista**, 219 A.3d at 1202 (quoting **Commonwealth v Huntington**, 924 A.2d 1252, 1259 (Pa. Super. 2007) and **Illinois v. Gates**, 462 U.S. 213, 238-39 (1983)). Unless the issuing authority had no substantial basis for its decision, a reviewing court must affirm. **Commonwealth v. Lyons**, 79 A.3d 1053, 1064 (Pa. 2013) (citing **Commonwealth v. Johnson**, 42 A.3d 1017, 1031 (Pa. 2012)). **See also Commonwealth v. Gagliardi**, 128 A.3d 790, 795 (Pa. Super. 2015) ("If a substantial basis exists to support the magistrate's probable cause finding, [the suppression court] must uphold that finding even if a different magistrate judge might have found the affidavit insufficient to support a warrant.").

> The existence of probable cause is measured by examining the totality of circumstances. [] **Gates**, [462 U.S. at 238]. "Probable cause exists where the facts and circumstances within the affiant's knowledge and of which he [or she] has reasonably trustworthy information are sufficient in and of themselves to warrant a [person] of reasonable caution in the belief that a search should be conducted." [] **Johnson**, [*supra*]. A magisterial district judge, when deciding whether to issue a search warrant, must "make a practical, common-sense decision whether, given all of

---

At any hearing on a motion for the return or suppression of evidence, or suppression of the fruits of evidence, obtained pursuant to a search warrant, no evidence shall be admissible to establish probable cause other than the affidavits provided for in paragraph (B).

Pa.R.Crim.P. 203(D).

the circumstances set forth in the affidavit ... including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id*. (citation omitted).

*Commonwealth v. Jacoby*, 170 A.3d 1065, 1081–82 (Pa. 2017).

When information in a search warrant affidavit depends on a tip from a confidential informant, this "may constitute probable cause where police independently corroborate the tip, or where the informant has provided accurate information of criminal activity in the past, or where the informant himself participated in the criminal activity." *Commonwealth v. Manuel*, 194 A.3d 1076, 1083 (Pa. Super. 2018) (*en banc*) (emphasis omitted) (citing *Commonwealth v. Clark*, 28 A.3d 1284, 1288 (Pa. 2011)).

In the case *sub judice*, the August 18, 2021, affidavit of probable cause averred that a reliable CI whose information had led to at least two felony convictions related that Appellant was in the business of selling Methamphetamines and was residing at 501 Goldfinch Drive along with a known drug dealer from whom the CI completed a controlled buy of Methamphetamine in July 2021. According to the affidavit, Lancaster Drug Task Force surveillance of Appellant's housemate's activities, which included the controlled buy, established the housemate's pattern of leaving 501 Goldfinch Drive for a short time to meet with individuals before returning directly to the residence. The affidavit also averred that the CI identified Appellant by the moniker "Jazz" when shown a PA JNET photograph of Appellant and reported to Detective Adam Weber within 48 hours of the search

warrant application that Appellant possessed a quantity of Methamphetamine for sale. Affidavit of Probable Cause, 8/18/21, at paragraphs 3-13.[3]

_____

[3] The relevant portions of the Affidavit of Probable Cause provided the following:

> 3. [D]uring the month of July[] 2021, Detective Adam Weber spoke with reliable Confidential Informant who reported that she/he had spoken with an unidentified white male that had state to CI that he had a quantity of controlled substances for sale. This CI is considered reliable in that the information the [sic] she/he has provided has resulted in two or more Felony convictions in regards to controlled substances. CI identified the subject with the first name of "Frank" as a white man with short, dark hair, a medium build and a light complexion. . . [who] was in the business of selling Heroin and Methamphetamines in Lancaster County, Pennsylvania. CI knew this to be true and correct as she/he had conversations with unidentified white male of buying Methamphetamines during the month of July 2021.
>
> 4. [D]uring the month of July[] 2021, your affiant used DI's description of "Frank" to locate a a [sic] JNET photograph of Frank A. Doman . . . . During the same month, Detective Weber showed CI a photograph of Frank A. Doman . . . who [sic] positively identified him as the subject that she/he referred to in paragraph 3 of this affidavit.
>
> 5. During the month of July[] 2021, Detective Weber had a conversation with CI, at which time CI reported that Frank A. Doman . . . was currently living at 501 Goldfinch Drive, Columbia, Lancaster County, 17512.
>
> 6. [D]uring the month of July[] 2021 your affiant was conducting surveillance when Frank A. Doman . . . was observed exiting the residence before meeting with individuals in Lancaster County for short periods, then re-entering the property.
>
> . . .

*(Footnote Continued Next Page)*

Through these averments, the Commonwealth established: the CI's reliability; investigating officers' independent corroboration in July of the housemate's participation in controlled buys occurring shortly after exiting 501 Goldfinch Drive; the CI's July confirmation that a dealer he knew as "Jazz" resided at 501 Goldfinch Drive; the CI's August identification of Appellant as "Jazz"; and the CI's report within 48 hours prior to execution of the warrant

---

9.    [D]uring the week of July 11, 2021, CI made a controlled buy of Methamphetamine from Frank A. Doman . . . .   While [under] surveillance, Frank A. Doman . . . was observed exiting 501 Goldfinch Drive, Columbia, Lancaster County, PA, before meeting with CI in an area of Lancaster County.  After meeting with CI for a short period of time, Doman was observed breaking contact with CI before returning to and re-entering the same address. . . .

10.    That during the month of July 2021, Detective Weber spoke with CI who advised him that she/he was aware that a subject he knew as "Jazz" who was also in the business of selling controlled substances in Lancaster County, PA was also residing at 501 Goldfinch Drive, Columbia, PA . . . .

. . .

12.    [D]uring the month of August[] 2021, your affiant searched the PA JNET database for a photograph of Jeffrey Shackelford . . . and showed it to CI.  CI positively identified the person in the photograph as the subject she/he referred to in paragraph 10 of this affidavit.

13.    [W]ithin 48 hours of this request, Detective Adam Weber spoke with CI, CI reported that Jeffrey Shackelford . . . had a quantity of Methamphetamine for sale.
. . . .

Affidavit of Probable Cause, 8/20/21, ¶¶ 3-6, 9-10, 12-13.

that Appellant had methamphetamine for sale. As such, the Affidavit of Probable Cause set forth a totality of circumstances establishing the fair probability that Methamphetamine possessed or controlled by Appellant and his housemate with the intent to deliver would be found at their 501 Goldfinch Drive residence, which was serving as the base of their operation. Accordingly, we discern no error with the suppression court's determination that the issuing authority possessed a substantial basis for determining there was a fair probability that contraband would be found at 501 Goldfinch Drive.

In Appellant's second issue, he challenges the trial court's ruling that denied his motion to sever the Drug Delivery Resulting in Death case at docket number 4171-2021 from the PWID case at docket number 3662-2021. He argues, "evidence tending to show that [A]ppellant is criminally responsible for the April 13, 2021, death of Ms. Hamilton is of no evidentiary value to proving [A]ppellant possessed controlled substances with the intent to distribute on August 18, 2021, or any of the other crimes charged under docket #3662-21." **See** Brief for Appellant, at 15. Therefore, he maintains, evidence concerning the April drug delivery to, and proximate death of, Ms. Hamilton would have been inadmissible in a separate trial on the charges of PWID stemming from the execution of the search warrant in August 2021, and thus required severance of the Drug Delivery Resulting in Death case.

The Commonwealth responds that the decision against severance was within the sound discretion of the trial court and is not subject to reversal unless Appellant establishes that a manifest abuse of discretion or prejudice

- 11 -

and clear injustice to Appellant resulted. *See* Brief for Commonwealth, at 15. A review of the record considering relevant rules of criminal procedure and evidence, respectively, shows Appellant has not borne his burden in this regard, the Commonwealth insists.

Whether separate criminal informations should be consolidated for trial is within the sole discretion of the trial court. We will reverse only for "a manifest abuse of discretion or prejudice and clear injustice to the defendant." ***Commonwealth v. Robinson***, 864 A.2d 460, 481 (Pa. 2004). It is the appellant's burden to establish prejudice. ***Commonwealth v. Melendez-Rodriguez***, 856 A.2d 1278, 1282 (Pa. Super. 2004) (*en banc*).

Pa.R.Crim.P. 582 and 583 address joinder and severance. Rule 582 provides that offenses charged in separate informations may be tried together if:

> (a) the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or
>
> (b) the offenses charged are based on the same act or transaction.

Pa.R.Crim.P. 582(A)(1).

Rule 583 authorizes courts to order separate trials if joinder of offenses in a single trial would prejudice a party. Prejudice, for purposes of Rule 583, "must be greater than the general prejudice any defendant suffers when the Commonwealth's evidence links him to a crime." ***Commonwealth v. Ferguson***, 107 A.3d 206, 210 (Pa. Super. 2015) (quoting ***Commonwealth v. Lauro***, 819 A.2d 100, 107 (Pa. Super. 2003)). Contemplated, instead, is

prejudice that "would occur if the evidence tended to convict the appellant only by showing his propensity to commit crimes, or because the jury was incapable of separating the evidence or could not avoid cumulating the evidence." ***Ferguson***, ***supra***.

> Reading these rules together, our Supreme Court established the following test for severance matters:

> > Where the defendant moves to sever offenses not based on the same act or transaction that have been consolidated in a single indictment or information, or opposes joinder of separate indictments or informations, the court must therefore determine: [(1)] whether the evidence of each of the offenses would be admissible in a separate trial for the other; [(2)] whether such evidence is capable of separation by the jury so as to avoid danger of confusion; and, if the answers to these inquiries are in the affirmative, [(3)] whether the defendant will be unduly prejudiced by the consolidation of offenses.

> *[Commonwealth v.] Collins*, 703 A.2d [418,] 422 [(1997)] (quoting *Commonwealth v. Lark*, ... 543 A.2d 491, 496–97 ([Pa.] 1988)).

*Ferguson*, 107 A.3d at 210–11 (Pa. Super. 2015) (citations omitted).

Appellant's argument focuses solely on the first prong of the three-part test identified above and is confined to the assertion that evidence of the April 2021 delivery to, and death of, Ms. Hamilton would not have been admissible in a separate trial on the PWID charge based on Appellant's August 2021 possession of controlled substances in his home.

We observe, first, that evidence of crimes other than the one in question may not be admitted solely to show a defendant's bad character or propensity

to commit the crime. Pa.R.E. 404(b)(1). However, evidence of other crimes is admissible to demonstrate motive, intent, absence of mistake or accident, a common scheme, plan, or design embracing the commission of two or more crimes so related to each other that proof of one tends to prove the others, or the identity of the person charged with the commission of the crime on trial. Pa.R.E. 404(b)(2). Additionally, evidence of other crimes may be admitted where such evidence is part of the history of the case and forms part of the natural development of the facts. *Lauro*, 819 A.2d at 107 (internal citations and quotation marks omitted). *See also Commonwealth v. Brown*, 52 A.3d 320, 326 (Pa. Super. 2012) (acknowledging that evidence of another crime may be admissible under the *res gestae* exception, defined as a "situation where the distinct crimes were part of a chain or sequence of events which formed the history of the case and were part of its natural development").

The trial court opines that evidence of each offense was admissible in a separate trial for the others to prove identity and the chain of events that linked the two cases pursuant to Pa.R.E. 404(b)(2). It follows, the trial court continues, that evidence of the April delivery to Ms. Hamilton was relevant and admissible to prove Appellant's August PWID:

> [T]he investigation into Carrie Hamilton's overdose death was inextricably linked to the investigation that culminated in the August 20, 2021, search of 501 Goldfinch Drive, which led to the PWID charges on information number 3362-2021. After discovering a chain of texts between Carrie and an individual saved in her phone as "Jazz", Detective Billiter reached out to

Detective Ziegler. Detective Ziegler was familiar with the number and identified it as belonging to "Jazz"—Appellant Jeffrey Shackleford—whom Detective Ziegler was investigating for dealing drugs.

At trial, Detective Ziegler testified that it was as a result of the investigation into Ms. Hamilton's death that he eventually applied for and executed the August 2021 search warrant that resulted in the seizure of controlled substances and the filing of the PWID charges against Appellant. It was only after Appellant's residence was searched and [he was] detained that he admitted to selling drugs to Carrie on the night before her death. Hence, there is a narrative relationship between the investigation into Carrie's overdose death and the subsequent search of 501 Goldfinch Drive. The two cases are naturally bound in such a way that the evidence relevant to each case was also admissible . . . to the other case under Rule of Evidence 404(b)(2) and under the "history of the case" exception. *See* [*Commonwealth v.*] *Keys*, [Nos. 2535, 2536 EDA 2021, 2022 WL 13737416, at *7 (Pa. Super. Oct. 24, 2022) (unpublished memorandum); *Commonwealth v. Arrington*, Nos. 913 MDA 2019, 1658 MDA 2019, 2020 WL 2070386, at *6 (Pa. Super. Apr. 29, 2020).

Trial Court Opinion, 11/9/22, at 7.

Appellant disagrees with the trial court's rationale and relies, instead, on *Commonwealth v. Carroll*, 418 A.2d 702, (Pa. Super. 1980), which held that the trial court in that case erred in failing to sever the charge of "Former convict not to own a firearm", 18 Pa.C.S. § 6105, from other charges including recklessly endangering another person, disorderly conduct, and two violations of the Uniform Firearms Act. We find *Carroll* distinguishable, however, both because it involved the admission of a previous *conviction* and because the previous conviction itself was relevant only to prove a necessary element to the "Former convict not to own a firearm" charge, had no connection to any

other charge, and therefore was not admissible under any of the exceptions enumerated in 404(b)(2).

Instead, far more instructive is the memorandum decision in *Arrington*, *supra*, to which the trial court's Pa.R.A.P. 1925(a) opinion cites for support of its ruling in favor of joinder.[4]   The pertinent facts in *Arrington* are quite similar to those in the present matter, as the defendant Arrington was arrested and charged with three crimes—a February 22, 2017, Drug Delivery Resulting in Death charge; a July 5, 2017, Delivery of a Controlled Substance charge; and, a July 10, 2017, PWID charge filed after his arrest, which occurred at the completion of authorities' extended surveillance of his dealings with the assistance of a CI.  *Id.* at **1-2.

The Commonwealth provided notice to Arrington that it intended to have a joint trial on the Drug Delivery resulting in Death case and the delivery of a controlled substance case.   When Arrington moved to sever the cases, the Commonwealth moved to consolidate the PWID case as well.   In denying Arrington's motion to sever and granting the Commonwealth's motion to consolidate, the trial court reasoned that evidence of each offense was admissible in a separate trial for the others to prove identity and the chain of events that became the history of the case.  *Id*.

---

[4] We acknowledge that the *Arrington* decision is not binding precedent but may be considered as persuasive authority.  *See* Pa.R.A.P. 126(b) (permitting the citation of non-precedential decisions filed by this Court after May 1, 2019, for their persuasive value).

Following a jury trial on all three cases, Arrington was acquitted of the Drug Delivery Resulting in Death charge but convicted on the remaining Delivery and PWID charges. Following sentence, Arrington filed a direct appeal *nunc pro tunc* and alleged, *inter alia*, that the trial court erred in trying the February Drug Delivery Resulting in Death charge together with the July Delivery and PWID charges. *Id*.

Relevant for purposes of the case *sub judice* is that Arrington claimed on appeal that joinder was inappropriate under Rule 582 because the evidence of each of his alleged offenses would not be admissible in separate trials on the other offenses. The Commonwealth responded that evidence of each offense related to the other offenses and, taken together, the evidence formed a logical narrative necessary to support its theory of the case, namely, that Arrington (who had operated under a pseudonym) supplied fentanyl to the CI, who provided it to Arrington's co-defendant, who provided it to the victim, who died of an overdose. As such, it was authorities' investigation into the February 2017 fatal overdose case that enabled it to collect evidence over the ensuing months needed to pierce Arrington's pseudonym, identify him as the supplier of fentanyl, and arrange a July 2017 controlled buy that resulted in Arrington's arrest and PWID charge. *Id.* at *5.

In affirming the trial court's order granting consolidation, we agreed with its rationale that evidence of each offense was admissible in a separate trial for the others to prove identity and the chain of events that became the history of the case. *Id.* at *6 (citing Pa.R.E. 404(b)(2) and **Brown**, **supra**). For the

same reasons, we supported the trial court's rejection of Arrington's prejudice claim that the evidence of other crimes only served to show his propensity to commit crimes, agreeing that "[a]t a minimum, the proffered evidence establishes identity and forms a complete story." **Arrington** at *6.

An identical rationale applies in the case *sub judice*. Here, the record establishes how the evidence surrounding the April drug delivery to Ms. Hamilton that resulted in her death enabled investigators to learn of Appellant's identity and his role in a drug dealing enterprise operating out of 501 Goldfinch Drive. In this way, evidence relevant to the Drug Delivery Causing Death charge provided the history of the case connected to both the July controlled buy and the August execution of the search warrant culminating with Appellant's PWID charge, and for that reason it was admissible. Accordingly, we discern no merit to Appellant's second issue.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/14/2023

- 18 -